# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| VENDAVO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-1725 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| KIM LONG, PRICE f(x) AG, and PRICE f(x) INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case represents just one front in a much broader conflict between Vendavo Inc. and Defendants Price f(x) AG and Price f(x) Inc. over intellectual property. The present skirmish concerns allegations that one of Plaintiff's former employees based in Chicago, Defendant Kim Long, stole trade secrets to be used on behalf of her new employer, Price f(x). The major issues currently before the Court are (1) Plaintiff's motion for a preliminary injunction [11] and (2) Defendants' motion to dismiss, or in the alternative, transfer [32]. For the reasons explained below, Plaintiff's motion [11] is granted in part and denied in part, and the Court will enter a preliminary injunction on the terms set out in Section VII. Relatedly, Plaintiff's motion for a sur-reply or alternatively to strike [103] is granted in part (as to the sur-reply) and denied in part (as to the request to strike); Defendants' motions to strike [93] and motion for leave to file a sur-reply [60 (sealed)]; [70 (unsealed)] are also granted. Finally, the Court grants in part Defendants' motion to dismiss [32]. Pursuant to 28 U.S.C. § 1404, the Clerk is directed to transfer the case forthwith to the Northern District of California, where the related case 3:17-cv-06930 (*Vendavo, Inc. v. Price f(x) AG, et al*) is pending. Defendants' motion to enjoin [73] remains open for disposition in the transferee court.

## I.    Background[1]

Vendavo, Inc. ("Plaintiff") filed this action against Defendants Kim Long ("Long"), Price f(x) AG and Price f(x) Inc. (collectively "Price f(x)") to address Long's purported misappropriation of Plaintiff's trade secrets.  As noted above, this is but one small piece of a much larger conflict between Plaintiff and Price f(x).  Consequently, the Court constrains its recitation of the facts to those specifically relevant to Long.

Plaintiff is a software company that provides "margin and profit optimization solutions" to other companies.  [12, at 34–35.]  Plaintiff's software allows those companies to better price their products and increase their overall revenue and profits.  [*Id.* at 35.]  One of the key parts of the sales process in the pricing industry is an intensive due diligence process involving "deep investigation by multiple stakeholders across a potential customer's entire organization and often can include investigation by outside consulting firms." [*Id.* at 35.]  One particularly important part of that due diligence process is the identification of a company's "pain points."  These pain points consist of areas in which a company is "falling short," for example, structural inefficiencies or other issues that lead the company to "lose" against the competition.  [78, at 57:25–58:14.]  Once Plaintiff has identified a company's "pain points," it creates a strategy around those pain points and explains how the company can use its software to address pain points and create solutions. [*Id.* at 58:21–25.]  To do so, it creates detailed power point presentations that contain both the "pain points" identified by Plaintiff and Plaintiff's marketing and sales strategy.  See, e.g, [12-1, at 172–194.]

---

[1] The parties dispute whether certain facts are properly before the Court at this time.  Although that dispute is addressed below in Section II *infra*, to the extent to that this summary references those facts, it reflects the Court's determination that they are properly before it at this time.

Plaintiff considers all this information highly confidential and takes certain measures to protect the information. For example, it requires all employees to sign a Confidential Information and Invention Assignment Agreement (the "CIIAA"), requires complex passwords to access its sales database where it stores information, protects the data base with technical safeguards (e.g., firewalls, *etc.*), and implements data security measures on all electronic devices. [12, at 38.] Additionally, Plaintiff does not allow employees to access all forms of information. [*Id.*] For example, financial information is only available to finance personnel and can only be provided to other employees on an as-needed basis. Likewise, Plaintiff confidentially maintains information regarding a customer's needs, which are generally summarized or included in customer pitch presentations, by requiring clients to sign non-disclosure agreements before Plaintiff ever provides substantive information, such as the initial pitch presentation. See e.g., [12, at 38–39.]

Defendant Long began working for Plaintiff in August 2007 as a business consultant based in Chicago. [12, at 39.] As a business consultant, Long served in a pre-sales capacity as a business and industry expert. [*Id.* at 40.] In other words, Long "worked with both existing customers and prospects through the sales cycle to assess a customer's pricing, to recommend and facilitate solutions and proposals, and to help deliver [Plaintiff's] products and services." [*Id.*] In her role as a business consultant, Long had access to critical information related to Plaintiff's "sales strategy and methodology, product, pricing, financials, business plans and other confidential information." [*Id.*] Because of her role, Plaintiff required Long to sign a CIIAA in which she agreed to use Plaintiff's confidential information for Plaintiff's exclusive benefit both during and after her employment. [*Id.* at 40, 54–55.] The CIIAA defined confidential information extremely broadly, but explicitly excluded any information that "has become publicly and widely known and

made generally available through no wrongful act of [Long] or of others who were under confidentiality obligations as to the item or items involved." [*Id.* at 54–55.]

Defendant Price f(x) is one of Plaintiff's direct competitors in the pricing software market. [80, at 51:3–4, 9–12.] Price f(x) was founded by former employees of Plaintiff between 2010 and 2011. [12, at 48.] Since its founding, Price f(x) has hired approximately 35 of Plaintiff's employees, including several key sales members in the United States and Europe. [*Id.*] After initially operating in Europe alone, Price f(x) expanded into the U.S. in 2015. [*Id.*] According to Plaintiff, the competition between the two significantly intensified in December 2017, which coincided with Price f(x)'s opening of its Chicago office that Price f(x) describes as its "new center of gravity." [*Id.*]

The events giving rise to this lawsuit began on January 22, 2019, when Long informed her manager that she planned to leave the company. [12, at 40.] Long's manager subsequently informed Megan MacLean, Plaintiff's Senior Vice President [for] North America Enterprise Sales. [*Id.* at 34, 40.] MacLean spoke to Long directly on January 23, 2019. [*Id.* at 40.] At that meeting, MacLean asked Long about her new employer. [*Id.*] Long represented that she had three offers, two with non-competitors and one with a competitor. [*Id.*] When MacLean directly asked whether Long was leaving to join Price f(x), Long demurred. [*Id.*] Nonetheless, MacLean suspected Long was leaving for Price f(x) given Long had resigned the previous year intending to leave for Price f(x). [*Id.*] In light of that suspicion, MacLean subsequently informed Long that she would no longer be going to a meeting with a prospective client scheduled for the next week. [*Id.* at 45.]

The next day, January 24, 2019, Long spoke with Jessica Shor, Plaintiff's general counsel, three times. [78, at 98:14–17; 103:9–16.] Shor initiated the first call to reiterate that Long could not take confidential information with her. [*Id.* at 103:17–104:3.] In response, Long told Shor

that she had no intention of doing so but wished to take her family photos and personal documents from her work computer. [*Id.* at 104:4–10.] Shor explained that personal documents did not pose a problem and that after Long had pulled all her documents into one place, Shor would have someone from IT perform a spot check to ensure that Long did not have any confidential information in that folder. [*Id.* at 104:12–20.] Long called Shor an additional two times after Shor's initial call. First, Long asked if she could take "documentation that she had created during her time at Vendavo, but had created from publicly available sources." [*Id.* at 105:19–22.] Long later called again to ask if she could take her "employee files, her offer letter, her CIIAA, and her comp plan." [*Id.* at 106:1–4.] With regard to the first category, Shor explained that those documents should not be taken, but with regard to the second, Shor told Long that she could keep her own employee files. [*Id.* at 105:22–25; 106:4–8.] In both cases, Long acknowledged Shor's response and thanked her. [*Id.* at 106:1–8.]

Long's last day with Plaintiff was January 28, 2019. [59-1, at 31 (72:23–73:10).] At some point thereafter, Plaintiff began an investigation into whether Long had misappropriated trade secrets at the time of her departure. [12, at 3.] Plaintiff asserts that this investigation provided evidence that Long had misappropriated a significant number of documents in her last several weeks at the company. [*Id.*] On March 12, 2019, Plaintiff filed the instant action asserting four claims regarding Long and Price f(x)'s alleged theft and misappropriation of its trade secrets: trade secrete misappropriation under Federal and State Law (Counts I & II), breach of contract (Count III), and conversion (Count IV). [1, at 11–15.] Along with that complaint, Plaintiff also a requested a TRO, [10–11], which the Court authorized on March 13, 2019. See [13], [15]. Specifically, on March 15, 2019, the Court authorized Plaintiff to search both Long's personal residence and Price f(x)'s Chicago headquarters with the marshals to locate the documents Plaintiff

purportedly took. [15, at 5.] Three days later, on March 18, 2019, Plaintiff carried out the searches. [80, at 36:5–38:14.] During the searches, Plaintiff asserts that it recovered additional trade secrets located on a large external hard drive at Long's home, in Long's work emails at Price f(x), in old work laptops at Long's home, as well as a banker's box of Vendavo documents.

Since then, the parties have conducted some discovery regarding Plaintiff's claims and extensively briefed Plaintiff's motion for a preliminary injunction. Following the close of that initial discovery, on June 6, 2019, the Court conducted an all-day hearing. See [78–80]. After the hearing, the Court requested additional briefing regarding several outstanding questions on June 20, 2019, [77], which the parties filed on July 2, 2019. [89], [91]. After yet another round of briefing on issues raised by those responses, see, e.g., [93], [103], the motion for preliminary injunction is now ripe for decision.

Additionally, in the interim, Defendants filed a motion to dismiss, or, in the alternative, to transfer the case to the Northern District of California where Price f(x) and Plaintiff are already engaged in a long-standing dispute regarding intellectual property. See generally [32], [33]. This motion has now been fully briefed as well—once again, after several additional briefs—and the Court will address it as well. However, before turning to the main events, the Court must address several threshold matters.

## II.  Defendants' Motion to Strike

Defendants have filed a motion to strike [93] seeking to exclude the new declarations of Jeremy Ben Blaney [89-14], Fred Cartwright [89-6], and David Freskos [89-9] filed by Plaintiff in support of its supplemental brief [89] requested by the Court following the preliminary injunction hearing [77]. Defendants object to Plaintiff's provision of new testimonial evidence after the hearing on the preliminary injunction. Defendants argue that it is unfair for Plaintiff to

offer testimony for which they will not receive any opportunity to cross-examine or impeach the witness. Plaintiff responds that the evidence was properly offered in response to the Court's questions, and that both parties submitted a significant number of new exhibits.[2]

First, while the Court has in the past allowed additional affidavits to be submitted after an initial around of briefing, in each of those instances the opposing party had sufficient time and opportunity to respond to them. See, e.g., *Luxottica Grp. S.p.A. v. Light in the Box Ltd.*, 2016 WL 6092636, at *4 (N.D. Ill. Oct. 19, 2016) (declining to strike affidavits submitted with a supplemental brief given defendant had ample time to review and respond to the plaintiff's brief and supporting declarations prior to the preliminary injunction hearing); *Brown v. Club Assist Rd. Servs. U.S., Inc.*, 2014 WL 1884461, at *2 (N.D. Ill. May 12, 2014) (allowing plaintiffs to file additional affidavits provided defense counsel was allowed sufficient time to review them).

Additionally, as Defendants point out, Plaintiff itself admits that the new affidavits by Freskos and Blaney are largely unnecessary as they simply confirm evidence that is already in the record. See, e.g., [107, at 3–4, 6–7]. Likewise, while it appears the Cartwright affidavit seeks to provide additional information, Plaintiff asserts that "each of these questions are supported by significant other evidence in the record, such that Mr. Cartwright's declaration does not alter the analysis or arguments presented in Vendavo's response to Questions Nos. 3 and 4." [*Id.* at 5.]

Thus, in an abundance of caution and in fairness to Defendants, and because Plaintiff acknowledges that the facts within them should not alter the Court's analysis or conclusions, the

---

[2] While it is true that the Court asked questions regarding what evidence supported certain points, Defendants are correct that when the Court asked those questions, it anticipated that the parties would direct the Court to evidence that had been previously entered into the record, not wholly new evidence that had not been previously submitted. Indeed, in light of the flood of evidence and briefing in this case, the Court's questions were designed to focus the parties on the arguments and evidence regarding what it believes are the central issues of the case, not open new fronts in this already sprawling litigation.

Court will disregard the additional affidavits from Blaney, Cartwright, and Freskos.[3]  Defendants motion to strike [93] is granted.

## III. Choice of Law

Two weeks after the parties submitted their supplemental briefs, Plaintiff moved for leave to file a sur-reply, or in the alternative to strike, Defendants' argument in its supplemental brief [90] that California law applies to the trade secret claims in this action.  [105.]  Given that (1) whether to grant a motion for leave to file a sur-reply lies within a district court's discretion, *Johnny Blastoff, Inc. v. L.A. Rams*, 188 F.3d 427, 439 (7th Cir. 1999); (2) Defendants assert that choice of law could prove dispositive because California law does not recognize the trade secret doctrine of inevitable disclosure, see [90, at 27–31]; and (3) the parties have fully briefed the issue, the Court grants the motion for leave to file a sur-reply and resolves the question.

California law does not allow a plaintiff to rely on a theory of inevitable disclosure when seeking an injunction on the basis of trade secret misappropriation.  See, e.g., *Whyte v. Schlage Lock Co.,* 125 Cal. Rptr. 2d 277, 294 (2002) ("we reject the inevitable disclosure doctrine").  In light of that holding, Defendants argue that any of Plaintiff's claims predicated on "inevitable disclosure" are foreclosed because Long's contract with Plaintiff included a choice of law provision selecting California law.  [90, at 27 (citing [12, at 66]).]  Plaintiff responds that the choice of law provision is exceptionally narrow and does not apply in this case.[4]

---

[3] Although Defendants complain about the inclusion and characterization of Plaintiff's Exhibit 159 [89-2], see [93, at 3 n.2], they do not move for its exclusion.  Consequently, the Court does not disregard that exhibit, though it does credit Defendants' explanation of the context surrounding [89-2].

[4] Defendants also note that Plaintiff did not raise inevitable disclosure until the evidentiary hearing.  See [105, at 2–3].  However, they do not argue that Plaintiff waived the argument, and thus the Court does not address that argument.

Defendants contend that Illinois law does not apply to the misappropriation claims against Long in light of the California choice-of-law provision in her CIIAA. A federal court exercising supplemental jurisdiction over state-law claims—in this case a state law trade secret misappropriation claim—applies the choice-of-law rules of the forum state. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). When determining if a contract's choice-of-law provision applies to related tort claims, Illinois courts apply a two-part analysis. See *Gen. Elec. Co. v. Uptake Techs., Inc.*, 2019 WL 2601351, at *8 (N.D. Ill. June 25, 2019). First, the court must examine the breadth and language of the choice-of-law provision. See *Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 863 (N.D. Ill. 2002). Second, it must determine whether the claims are dependent on the agreement and thus subject to the choice-of-law clause. *Id.*

Here, the choice of law clause is exceptionally narrow, stating only that the "validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of California." [12, at 66.] And Plaintiff's misappropriation claims could exist absent the contract. Consequently, the Court concludes that Illinois law controls Plaintiff's misappropriation claims. See, e.g., *Gen. Elec. Co. v. Uptake Techs., Inc.*, 2019 WL 2601351, at *8 (N.D. Ill. June 25, 2019) (choice of law provision did not apply given the narrowness of the provision and the independence of the misappropriation claims); *Precision Screen Machines Inc. v. Elexon, Inc.*, 1996 WL 495564, at *2 (N.D. Ill. Aug. 28, 1996) (same). With these threshold issues resolved, the Court turns to Plaintiff's motion for a preliminary injunction and Defendant's motion to dismiss.

## IV. Preliminary Injunction

### A. Legal Standard

In *Valencia v. City of Springfield, Illinois*, the Seventh Circuit recently articulated the controlling standard for the award of a preliminary injunction:

> An equitable, interlocutory form of relief, a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it. It is never awarded as a matter of right. To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase.

> To survive the threshold phase, a party seeking a preliminary injunction must satisfy three requirements. It must show that: (1) absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) its claim has some likelihood of succeeding on the merits.

> If the moving party satisfies each of these requirements, the court proceeds to the balancing phase of the analysis. In the balancing phase, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief. In so doing, the court employs a sliding scale approach: the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor. Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the public interest).

883 F.3d 959, 965–66 (7th Cir. 2018) (internal quotations, citations, and punctuation omitted).

### B. Analysis

Plaintiff's and Defendants' briefing focuses almost entirely on the proprietary of granting a preliminary injunction on the basis of Defendants' misappropriation and Long's inevitable disclosure of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.* (Count I) and the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.* (Count

II).[5]  Thus the Court has only addressed the likelihood of success on those two counts.  For the reasons explained below, the Court concludes that Plaintiff has demonstrated the propriety of granting at least some of the relief it seeks.

## 1.  Likelihood of Success on the Merits

"A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits.  Instead, he must only show that his chances to succeed on his claims are 'better than negligible.'"  *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017) (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)).  As the Seventh Circuit has explained, this is a relatively low bar.  *Id.* (citing *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011)).

For Plaintiff to show that Defendants misappropriated a trade secret, Plaintiff must demonstrate that the information in question was "(i) secret (that is, not generally known in the industry), (ii) misappropriated (that is, stolen from it rather than developed independently or obtained from a third source), and (iii) used in the defendants' business."  *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265–66 (7th Cir. 1992); *see also Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 896 (N.D. Ill. 2019).  Because Plaintiff asserts that Defendants have misappropriated its trade secrets in at least two ways, the Court will analyze each theory of misappropriation separately.  However, before determining whether any information was misappropriated, the Court must first determine what, if any, information may be treated as a trade secret.

---

[5]  Given the "pertinent definitions of the two acts overlap," *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 2017 WL 1954531, at *2 (N.D. Ill. May 11, 2017), the Court will analyze the DTSA and ITSA claims together.

### a. Nature of the Information

A trade secret may encompass any form or type of "financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes." 18 U.S.C. § 1839(3); *see also* 765 ILCS 1065/2(d) (defining a trade secret as "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers"). Regardless of exactly what type of information or what form it exists in, to be a trade secret the information must be (1) "sufficiently secret to impart economic value because of its relative secrecy" and (2) the Plaintiff must make "reasonable efforts to maintain the secrecy of the information." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003); *see also* 18 U.S.C. § 1839(3) ("the term 'trade secret' means all forms and types of * * *information, * * *if-- (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information"); 765 ILCS 1065/2(d) ("'Trade secret'" means information, * * * that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.")

In analyzing whether a purported trade secret meets these requirements, Illinois courts look to the following six factors: "(1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others

involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003) (collecting cases).

As an initial matter, Defendants assert that Plaintiff's trade secret claims fail "out of the box" because Plaintiff has failed to identify particular trade secrets subject to protection. As numerous courts have explained, where a plaintiff suggests that general categories of information are trade secrets, the lack of specificity greatly reduces its chances of demonstrating that a defendant has misappropriated its trade secrets. See, e.g., *PrimeSource Bldg. Prod., Inc. v. Huttig Bldg. Prod.*, Inc., 2017 WL 7795125, at *15 (N.D. Ill. Dec. 9, 2017); *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (noting that the plaintiff must point to concrete secrets, not broad areas of technology, to prevail on trade secrets claim); see also *Service Ctrs. of Chi., Inc. v. Minogue*, 535 N.E.2d 1132, 1135 (Ill. App. Ct. 1989) (reversing grant of preliminary injunction where plaintiff "consistently failed to identify with any degree of particularity the alleged trade secrets or confidential information in need of protection"). Such particularly is necessary given that a plaintiff cannot prevail at trial under either the DTSA or ITSA unless it identifies its trade secrets in sufficient detail that the trier of fact can determine what information comprises the secret and whether it was kept secret. *GlobalTap LLC v. Elkay Mfg. Co.*, 2015 WL 94235, at *5–6 (N.D. Ill. Jan. 5, 2015).[6] Consequently, "where a plaintiff cites

---

[6] Indeed, the Seventh Circuit has explicitly rejected the notion that every piece of information or document from an employer can be a trade secret. *Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 672 (N.D. Ill. 1997) ("On that score this Court has spoken plainly of the legal insufficiency under *AMP* of such a "blunderbuss statement that 'Everything you got from us was a trade secret.'") (citation omitted).

[only] general categories of information, but 'never singles out any particular trade secret, explaining how it created and safeguarded that particular bit of information,' the lack of particularity renders it unlikely to succeed on its trade secrets misappropriation claim." *PrimeSource Bldg. Prod., Inc*, 2017 WL 7795125, at *15 (quoting *Traffic Tech, Inc. v. Kreiter*, 2015 WL 9259544, at *20 (N.D. Ill. Dec. 18, 2015); but see *APC Filtration, Inc. v. Becker*, 646 F. Supp. 2d 1000, 1010 (N.D. Ill. 2009) (granting summary judgement and finding that Defendant had misappropriated certain categories of information).

Here, Plaintiff originally pointed to five categories of information that Ms. Long allegedly stole and later delivered to Vendavo:

> (1) Vendavo's customer list, including identification of future customers and customer revenue potential; (2) Vendavo's sales projections and its sales "pipeline" it has cultivated for its future growth; (3) Vendavo historical sales revenue reports; ( 4) Vendavo's most up-to-date marketing plans, including details of Vendavo's future plans for client and product development; and (5) Vendavo's current and future pricing models, including the "science" behind how it prices its products.

[12, at 18–19.] Despite Defendants' protestations to the contrary, these categories are sufficiently definite for the Court to determine "what information comprises the secret and whether it was kept secret." Nonetheless, and perhaps in light of Defendants' arguments, Plaintiff slightly reformulated these categories in its response to the Court's supplemental questions [77] following the preliminary injunction hearing on June 6, 2019.[7] Reworded and reformulated, Plaintiff argues that Long and Price f(x) misappropriated the four following categories of information:

> (1) customer-specific information, such as product preferences, deviated pricing, and contract terms; potential customer and existing customer "discovery," such as "pain points" (key pricing challenges and drivers for that customer/potential

---

[7] While Defendants suggest that it would be improper for the Court to allow Plaintiff to amend its trade secret list, see [90, at 8–9], none of the reformulated categories of trade secrets contain information that Plaintiff did not previously assert in its briefing prior to the hearing on June 6, 2019 or in the hearing itself. Defendants therefore had sufficient notice and could address any category of information at the hearing or in the supplemental briefing the Court subsequently requested.

customer), business cases, and implementation methodologies (*i.e.* the solution vision and solution design);

(2) potential customer opportunities obtained through Ms. Long's work at Vendavo;

(3) names and contact information for customers, including identities of the decision-makers, obtained through Ms. Long's work for Vendavo;

(4) details of Vendavo's confidential marketing plans; and

(5) Vendavo's financial information, including sales "pipelines" cultivated for future growth and sales revenue reports.

[89, at 10 (citing [1], at ¶¶ 25, 27; [12], at 5–10; [59], at 17).]  With those categories in mind, the Court turns to whether each qualifies as trade secret.

### i. Category 1

The Court concludes that Plaintiff has shown, at least preliminarily, that the customer-specific information in the first category—in particular a customer's "pain points" and the specific solutions developed to address those "pain points"—are trade secrets.  First, multiple courts have concluded that "customer-specific information" may warrant trade secret protection.  See, e.g., *Mickey's Linen v. Fischer*, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017) ("customer-specific information warrants trade secret protection so long as it was maintained in confidence"); *APC Filtration, Inc.*, 646 F. Supp. 2d at 1010 (concluding that "customer-specific information, such as product preferences and deviated pricing" was protectable under the ITSA); *Abrasic 90 Inc.*, 364 F. Supp. 3d at 897–98 (concluding that information was protectable, even though the vast majority of it was publicly available, as it had been compiled into one place after substantial effort).

The one case cited by Defendants to the contrary, *Unisource Worldwide, Inc. v. Carrera*, 244 F. Supp. 2d 977, 988 (C.D. Ill. 2003), addressed a distinguishable set of circumstances.  In *Unisource*, the Central District of Illinois concluded that a *distributor* had no property interest in information that belonged to a customer, such as the "customer's own purchase history, needs and

preferences" *Id.*  Here, however, it is not apparent that a client's "pain points" and Plaintiff's solutions for those issues even belong to Plaintiff's client.  The information in question is produced by Plaintiff's efforts to identify and solve pricing issues of which their clients may not even be aware.  For example, in one case Plaintiff identified a number of deficiencies in a client's pricing strategies, including that its "digital channels often lag peers" and that it needed "strong digital tools and data capabilities to understand and serve customers."  [12-1, at 189.] Plaintiff reached this conclusion through interviews and other conversations with that client.  [*Id.*]  Presumably, no competitor could come to those conclusions without also conducting its own due diligence review of the client and its systems.[8]  Moreover, as Judge Pallmeyer explained in *SKF USA, Inc. v. Bjerkness*, the notion that "the ability of customers to share [ ] information" destroys the confidentiality of that information "has been explicitly rejected by Illinois Courts."  636 F. Supp. 2d 696, 713 (N.D. Ill. 2009) (collecting cases).  Thus, there is reason to doubt that *Unisource* remains good law.

Finally, it appears the value of identifying a client's "pain points" and providing proposed solutions to them in the various presentations Plaintiff has identified arises from the difficulty of compiling that information.  From the evidence currently before the Court, it appears that both the pain points and their solutions are non-public and include essentially all the background work that a competitor would have to undertake before pitching their own services to the same client.  Indeed, given the testimony that Plaintiff signs non-disclosure agreements with its clients, [78, at 57:6–11], it appears that even clients themselves not permitted to share this information—presumably so that they may not pass this information to a Vendavo competitor who could then use the

---

[8]  It also appears prospective clients sometimes provide their own confidential presentations regarding their pricing systems that Vendavo is presumably under an obligation to keep secret.  See, e.g., [59-4 (2018 presentation marked strictly private and confidential from a Vendavo client detailing its pricing issues).]

information to offer identical services at a lower price.  See, e.g., [55-17, at 2 (prohibiting clients from disclosing any information marked confidential for five years).]  Thus, even if the component parts of a company's "pain points"—*i.e.* a company's pricing issues—could be thought of as "public," the difficulty of compiling all the information without investing significant time and resources into identifying a client's issues and developing solutions oneself, makes the "pain points" and Plaintiff's solutions to those issues protectable as a trade secret.  See, e.g., *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 714 (N.D. Ill. 2009) (As to the requirement "that the materials not be widely known in the industry, * * * even if they are just compilations of otherwise readily known facts, the compilations themselves are not available to competitors and presumably have some value by gathering the materials into one place."); *Master Tech Products, Inc. v. Prism Enterprises, Inc.*, 2002 WL 475192, *5 (N.D. Ill. 2002) ("Courts often look to how easily information can be duplicated without involving substantial time, effort, or expense" when "ascertaining whether information is a trade secret."); 18 U.S.C. § 1839(3) (including "compilations" in definition of trade secret); 765 ILCS 1065/2(d) (same).

That said—despite Plaintiff's claims to the contrary, see [89, at 19–23]—this client-related information cannot be protectable as a trade secret forever.  Plaintiff has not provided sufficient evidence to suggest that such information remains valuable in perpetuity as companies evolve and information becomes stale.  At the same time, the evidence suggests that the sales cycle in Plaintiff's industry can be quite long.  For example, it appears the Metrie sales cycle took almost two and a half years from start to finish.  See [12, at 37 (¶ 12).]  Given the possibility of multi-year sales cycles and the testimony that client-related information remains valuable during those cycles, the Court concludes that Plaintiff is entitled to a presumption that any customer-related trade secrets produced or accessed in the last three years remains valuable.  The fact that Long accessed

a document within the last three years itself provides *prima facie* evidence that information contained within that document was still relevant and/or valuable at the time, and therefore protectable as a trade secret. For information older than that, however, the Court is not convinced that such information remains protectable as a trade secret based on the existing record.

### ii. Categories 2 & 3

Likewise, the information in the second and third categories is the kind that courts generally recognize may merit trade secret protection. See, e.g., *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 874 (N.D. Ill. 2001) (holding that "names and addresses of all customers and potential customers and contact persons" was sufficiently secret to warrant trade secret protection). As *RKI, Inc.* suggests, however, while such information is protectable, Plaintiff must demonstrate that the information was sufficiently secret, or kept sufficiently secret, to warrant trade secret protection.

With regard to Plaintiff's customer list, Plaintiff has not shown that it is sufficiently secret to warrant protection at this point. First, Mark Horner, Plaintiff's Chief Operation officer, admitted at the preliminary injunction hearing that the fact that a particular entity was a customer of Plaintiff was not confidential. [78, at 53:24–54:2 (Horner's position at Plaintiff); 66:18–23 (Horner testifying that it "is not confidential that they're a customer of ours")]. But see [78, at 120:9–24 (Jessica Shor, Plaintiff's general counsel, testifying that a customer may not be free to disclose the fact that it uses Plaintiff's software)]. Second, Plaintiff regularly identifies current customers as part of its marketing/advertising to prospective customers via one or more "logo slides." See, e.g., [55-15, at 11]. And although these presentations are generally subject to a confidentiality agreement, [78, at 119:20–120:1], Horner explained that he was unaware of any instruction to Plaintiff's employees that the customer list itself was confidential, [78, at 67:11–21]. Finally, prior to Plaintiff's move to its current headquarters, the logos of Plaintiff's clients were displayed on the

walls of Plaintiff's headquarters. [78, at 65:20–22.] In light of this evidence, the Court cannot conclude that Plaintiff's actual list of customers is sufficiently secret to warrant protection.

Likewise, Plaintiff has not presented any evidence of specific "potential customer opportunities obtained through Ms. Long's work at Vendavo" that are actually confidential. As Defendants point out, prospective clients often affirmatively advertise the fact that they are seeking bids for pricing solutions or even rely on outside consultants to help run the process of identifying a pricing software vendor. See, e.g., [78, at 94:14–16 (Horner testifying that Price f(x) won the Mabe contract based in part on its connection with Bain, Mabe's advisor).] Indeed, while Plaintiff goes to great lengths to explain why potential client opportunities could be confidential, see [89, at 16-19], it has not pointed to a single specific example of a prospective customer that was only known to Plaintiff and had not reached out to one of Plaintiff's competitors. Consequently, the Court cannot conclude that Plaintiff has shown at this point that client opportunities are inherently secret such that they warrant trade secret protection.

But the opposite is true as to "names and contact information for customers, including identities of the decision-makers, obtained through Ms. Long's work for Vendavo." The fact that Long included who she knew at various companies who have or may need pricing solutions in a "business plan" pitch to Price f(x) in 2017 illustrates the value of this information. In fact, those contacts appear to have been a major selling point in Long's favor as she considered joining Price f(x). See generally [72-3].[9] Likewise, the fact that Long's friend specifically asked her if she knew a specific contact at one of Plaintiff's customers suggests that the information is not widely available. [72-3, at 2.] The fact that key contacts at various companies may have LinkedIn

---

[9] Importantly, while the presentation prepared by Long [72-3] bears Price f(x) logos and confidentiality stamp, Long appears to have created the document while still working at Plaintiff, given that at the time of the email—October 28, 2017—Long still worked for Plaintiff.

accounts that identify their position does not change the analysis. See, e.g., *Ooyala, Inc. v. Dominguez*, 2018 WL 3360759, at \*6 (D. Mass. July 10, 2018). As *Ooyala, Inc.*, explained, LinkedIn profiles do not provide specific contact information that one who previously worked with these individuals may have and, more importantly, they generally do not identify someone as a key decision maker. *Id.* Notwithstanding Defendants' claims to the contrary, it clearly takes time and effort to develop such information. Thus, the Court concludes that contact information may qualify as a trade secret if kept sufficiently secret.[10] See *RKI, Inc.*, 177 F. Supp. 2d at 869; see also *APC Filtration, Inc. v. Becker*, 646 F. Supp. 2d 1000, 1010 (N.D. Ill. 2009) (concluding that defendant had misappropriated the "names and addresses of contact persons of customers, potential customers, and suppliers").

### iii. Category 4

While Defendants complain that Plaintiff has failed to sufficiently identify the trade secrets at issue in this case, there can be no doubt that it has identified numerous specific slide decks or "customer pitches" that purportedly contain trade secrets. See, e.g., [59-4]; [59-7]; [59-8], [59-13]. Specifically, with regard to Category 4, Plaintiff alleges that these slide decks include confidential marketing strategies that would be invaluable to competitors seeking to compete against it.

Category 4 largely overlaps with Category 1 in the sense that marketing strategy involves using information gleaned from a client to tailor a pitch to that client. In light of that, courts have recognized that a company's marketing strategy, and in particular its "pitch decks" may be protected as trade secrets. See, e.g., *Signal Fin. Holdings LLC v. Looking Glass Fin. LLC*, 2018

---

[10] While Defendants also point to the ease of identifying members of the Professional Pricing Society as a source of contacts, see [90, at 14–15], they do not show that one could have identified any of the individuals listed in Long's presentation from that organization or at one of its meetings. Nonetheless, this may be an area that Defendants can show should not warrant trade secret protection as the case advances.

WL 636769, at *3–4 (N.D. Ill. Jan. 31, 2018) (granting preliminary injunction to prohibit a former employee's use of a pitch deck); see also *Mickey's Linen v. Fischer*, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017) (explaining that marketing strategies as to a given customer were protectable as a trade secret). As Judge Lefkow explained in *Signal*, while even a unique combination of otherwise publicly available information may qualify for trade secret protection, such a combination is even more likely to receive protection when it includes unique information. *Id.* at 4. In *Signal*, for example, the fact that the slide presentation contained unique financial and statistical information created by the plaintiff and had reorganized certain public information "in such a way that it presented the statistics in a way the company wanted to present it," strongly weighed in favor of finding the presentation a trade secret. *Id.* at 4.

As in *Signal*, Plaintiff has demonstrated that it incorporated client-unique information in each of pitch decks to "tailor them to each customer's needs, to best present itself and its proposed implementation methodologies to potential customers." [89, at 18 (citing [12, at 39]).] Thus, the sales strategy encompassed in Plaintiff's sales presentations may qualify as a trade secret provided that the strategy was sufficiently secret.

With regard to the secrecy of the information, Defendants correctly note that at least one of these slide decks is currently publicly available on the internet and suggest that others are as well. See [78, at 69:23–73:24]. However, as noted above, every client was required to sign a non-disclosure agreement and a legend on each of the presentations notes that it is "Proprietary & Confidential" or contains some other indicator that it is not to be shared. See, e.g., [59-9, at 2]. As other courts have concluded, that is enough to at least preliminarily meet the requirement for confidentiality. See, e.g., *Signal Fin. Holdings LLC v. Looking Glass Fin. LLC*, 2018 WL 636769, at *4 (N.D. Ill. Jan. 31, 2018) (granting a preliminary injunction where the presentation in question

was marked "CONFIDENTIAL—NOT FOR DISTRIBUTION" and each third party who received a copy of the slide deck was required to sign an NDA). Whether Plaintiff did enough to keep the information secret is a different question which the Court shall address in greater detail as to all five categories in Section (b) below. But, at least as an initial matter, Plaintiff's marketing strategy as reflected in its client presentations is the kind of information entitled to trade secret protection.

### iv. Category 5

Finally, Plaintiff asserts that Long took confidential financial information, including "sales 'pipelines' cultivated for future growth and sales revenue reports." [89, at 18]. There is no doubt that this information is confidential and derives value from its secrecy. See, e.g., *RKI, Inc.*, 177 F. Supp. 2d at 874 (concluding "historical sales information" warranted trade secret protection); *Mickey's Linen*, 2017 WL 3970593, at *4 (holding a company's financial information a protectable trade secret).

### b. Secrecy of the Information

With the general protectability of the information addressed, the Court turns to whether Plaintiff has taken reasonable efforts to keep it secret. As an initial matter, it appears Plaintiff did take reasonable steps under the circumstances to protect the information in Categories 1–5, with the exception of its list of customers and general client opportunities as explained above. First, Plaintiff physically secured its facilities, including limiting access to particularly sensitive areas such as the local server room. [78, at 60:9–12.] It also implemented technological security such as requiring laptops, servers, *etc.* to be encrypted using complex passwords as well as multi-factor authentication to access its network remotely. [*Id.* at 60:12–14; 60:22–61:4.] Likewise, it limited access to the Salesforce database—where Plaintiff kept all the documents containing the information examined above with the exception of financial data—to only those employees whose jobs required them to access it. [*Id.* at 61:5–25.] Plaintiff's financials, by contrast, were kept

within a different system, which only the finance team could access without a specified need. [*Id.* at 61:20–25.] Plaintiff also protected its confidential information by requiring its employees and prospective customers to sign non-disclosure agreements prohibiting them from revealing any proprietary knowledge they received during their respective employment and contract negotiations. See [12, at 54–55 (employee NDA)]; [78, at 57:6–11 (explaining the NDA process with prospective clients)]. Finally, Plaintiff also provided training to employees on confidentiality when they were onboarded,[11] though it appears that the yearly "mandatory annual training on security" refresher course has only been held once. [78, at 99:20–100:11; 91:16–21.]

As explained above, Courts have generally found these protections sufficient to garner trade secret protection for a company's private information. See, e.g., *Signal*, 2018 WL WL 636769, at *4 (marking documents confidential and requiring third parties to sign an NDA sufficient to warrant trade secret protection); *Huawei Techs. Co. v. Motorola, Inc.*, 2011 WL 612722, at *9 (N.D. Ill. Feb. 22, 2011) (same); *SKF USA Inc. v. Bjerkness*, 2010 WL 3155981, at *6 (N.D. Ill. Aug. 9, 2010) (finding plaintiff took reasonable efforts to maintain the secrecy of its information where it (1) required employees to sign secrecy agreements, (2) implemented password protection for important files and granted access to different sets of documents based on employees' duties, (3) instructed employees not to share its databases with customers, (4) and only shared information with customers after having the customer sign a nondisclosure agreement); *RKI, Inc.*, 177 F. Supp. 2d at 866 (granting preliminary injunction where plaintiff only provided information to employees on a need-to-know basis, maintained the security of the information through "such means as limited access and password-protected computer databases," and required

---

[11] Shor did not work for Plaintiff at the time of Long's hiring, and therefore could not testify as to whether Long received the new-hire training regarding confidentiality but did testify that Long attended some of the sessions she gave to the sales team on "confidentiality, the NDA process, et cetera." [78, at 100:12–20.]

employees to sign employment agreements or acknowledge the receipt of employee handbooks that contained non-disclosure clauses).

Defendants raise several arguments in support of their contention that Plaintiff has not sufficiently protected its information to warrant trade secret protection. First, Defendants make a great deal of the fact that Plaintiff did not actively monitor or put in place safeguards that would prevent individuals from downloading information from Plaintiff's Salesforce database and immediately emailing or otherwise sharing the information outside the company. See [78, at 63:16–64:24]. While employees were allowed to download and store information from Salesforce on their personal computers after successfully logging into the site, only those employees who needed access to the site could log in and do so. Additionally, all those employees were required to sign confidentiality agreements in which they agreed not to disclose proprietary information.[12] A company need not monitor its employees like a police state to garner trade secret protection for its confidential information. Rather, it must take "reasonable protective measures for its claimed trade secret under the circumstances." *Fail-Safe, LLC v. A.O. Smith Corp.*, 674 F.3d 889, 893 (7th Cir. 2012); see also 18 U.S.C. § 1839(3) ("the owner thereof has taken reasonable measures to keep such information secret"); 765 ILCS 1065/2(d) (information, * * * [that] is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.").

---

[12] Defendants argue that the CIIAA is insufficient as a means to put employees on notice of what constitutes trade secret information because it does not specify what information is confidential and therefore protected. [51, at 31.] However, the client pitch presentations—the primary repository for all the information Plaintiff alleges was misappropriated—each contain a legend specifically stating that they are "Proprietary & Confidential." See, e.g., [55-15, at 3.] Defendants have not presented any case law to support the notion that to effectively protect a trade secret, an NDA must specify exactly what information it protects. Thus, the Court concludes that the CIIAA, combined with the other notices provided to Long, were sufficient to put her on notice of the confidentiality of the information she possessed.

Here, by limiting access to Salesforce to only those employees who needed it,[13] marking the slide-decks with a confidential legend, and requiring employees who could access the information to sign a confidentiality agreement, Plaintiff has met its burden of taking reasonable measures.

Likewise, the fact that Plaintiff has apparently shared initial presentations with a customer prior to signing an NDA with that customer, see, e.g., [55-15], [55-17–55-19], does not automatically doom Plaintiff's claims. The question is whether Plaintiff shared information for which it now seeks trade protection without having an NDA in place. A review of the presentation cited as an example by Defendants [55-15], shows that while it contains Plaintiff's customer list and some generic marketing, it does not contain information regarding the customer's pain points, or Plaintiff's proposed solutions to those pain points. Nor does it include the key contacts at the customer. Furthermore, the presentation clearly states at the beginning that the document "may only be shared with qualified customers and prospects that have a signed NDA with Vendavo." [55-15, at 4.] In the two cases cited by Defendants, it does not appear that any confidentiality or non-disclosure agreements was ever signed. See, e.g., *Abraisic 90*, 364 F. Supp. 3d at 898 ("the company's failure to require those with access to its supposed trade secrets to enter into non-disclosure and confidentiality agreements has to be counted among the most fundamental omissions by the company").[14] By contrast, here it appears that Plaintiff always required customers to sign non-disclosure agreements, though occasionally after its initial presentation to a

---

[13] The fact that the sales team with access to Salesforce amounts to approximately 1/3 of Plaintiff's total workforce, see [54-13, at 4:13–5:25], does not change the analysis.

[14] In the other case cited by Defendants, *Rainbow Nails Enterprises, Inc. v. Maybelline, Inc.*, the court found the agreement in question only related to one technology, and not the technology that was allegedly misappropriated, and that therefore the confidentiality agreement could not apply to the non-covered technology. 93 F. Supp. 2d 808, 822 (E.D. Mich. 2000). By contrast, here the CIIAA covered any confidential information that Plaintiff's employees used while at the company, making it distinguishable from *Maybelline*.

target.  Moreover, Defendants have not presented any cases in which a late NDA—as opposed to the complete absence of a NDA—doomed the protection of given information.  For all of these reasons, the Court concludes that Plaintiff has taken adequate steps to ensure the confidentiality of its trade secrets identified in Section (a).

### c.  Misappropriation

Having concluded that at least some of the information that Plaintiff asserts Long took for the benefit of Price f(x) was of a kind and sufficiently secret to warrant trade secret protection, the Court turns to whether Plaintiff has shown that the information was actually misappropriated.  Plaintiff asserts both that (1) Long has already misappropriated its trade secrets and threatens to do so again without the issuance of a further injunction, and (2) in her new position with Price f(x), Long will inevitably disclose trade secrets.  Because the two theories involve different analyses, the Court addresses them separately.

A plaintiff may show actual trade secret misappropriation under Illinois and Federal law in several ways.  For example, one can misappropriate trade secrets by "acquiring" them through improper means such as the breach of a confidential relationship.  765 ILCS 1065(b)(1).  Misappropriation also occurs when a defendant breaches a duty owed to protect the secrecy of its information or induces another party to do so.  *Mintel Int'l Grp., Ltd. v. Neergheen*, 2008 WL 2782818, at *3 (N.D. Ill. July 16, 2008) (citing 765 ILCS 1065(b)(2)(B)).  Indeed, the DTSA defines misappropriation as "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 920 (N.D. Ill. 2016).  The statute

further defines "improper means" as including "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6).

Here, Defendants do not dispute that Long's contract with Plaintiff required her to keep certain information confidential. Rather, they argue that Long did not disclose any confidential information while at Price f(x) or that Plaintiff failed to adequately protect the information for it to qualify as a trade secret. See generally Sections (a), (b) *supra*. Specifically, Defendants make a great deal of the fact that Long never received a proper exit interview and that Plaintiff did not ensure it had taken all her devices back or take any efforts to ensure she had actually returned all the information it considered a trade. See, e.g., [51, at 17–19] However, "[i]t is generally recognized in Illinois that at the termination of employment, an employee may not take with him confidential, particularized plans or processes developed by his employer and disclosed to him while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an advantage over his competitors." *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1202 (7th Cir. 1987). Thus, even if Plaintiff could have done more to ensure that Long did not retain any confidential information in electronic or physical form—and the Court agrees it should have—Long still had a responsibility not to use or disclose any of that information. Likewise, the prohibition against using the trade secrets of one's former employer applies regardless of whether the information is stored in electronic or physical form, or simply resides in one's head.[15]

---

[15] That is not to say, as the Court has repeatedly stated throughout this opinion, that an individual may not use her generalized knowledge and the skills learned in her previous job in her new employment. Rather, it is simply to say that the fact that a trade secret was not misappropriated from an external source, but rather from an employee's memory, does not remove its trade secret protection. See generally *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995).

With those introductory comments, the Court turns to the question at hand. Plaintiff has shown that Long retained documents or sent emails to her colleagues at Price f(x) that contain information that the Court has concluded are generally protectable as a trade secret. See, e.g., [12-1, at 189 (presentation detailing key challenges of a prospective client in 2018)]; [59-19, at 2 (email explaining key challenges of prospective client)]; [59-4 (2018 presentation marked strictly private and confidential from a Vendavo client detailing its pricing issues)]. As noted above, Defendants argue that the vast majority of the documents that Long retained are far too old to warrant protection in any regard, see [90-12, at 16–21], and a review of the list of documents submitted by Plaintiff shows that many of the documents that even possibly contain trade secrets are more than five years old, see, e.g., [72-1, at 11 (listing multiple documents dating from 2009-11)]. Regardless of whether Plaintiff will ever be able to show these documents contain trade secrets, however, the three documents cited above clearly contain valuable information given they are less than a year old and relate to companies (Herman Miller and Mabe) that Plaintiff and Price f(x) were actively competing for until recently. See [12-1, at 189]; [59-19, at 2].

In particular, Long's email to one of her co-workers in response to his question regarding a particular prospective client appears to contain the key "pain points" or pricing issues faced by Herman Miller, information that Long apparently gained during her tenure with Plaintiff. See [59-19, at 2]. While one of Defendants' witnesses briefly attempted to categorize this information as consisting of "general industry wide" problems at the hearing, see [80, at 74:12–76-4], the same witness also acknowledged that at least some of the information was specific to Herman Miller, [*id.* at 75:22–76:4]. Defendants have not asserted, much less presented any evidence, that the information that Plaintiff shared in that email came from an independent source other than Long's experience at Plaintiff. Thus, the Court concludes that Plaintiff has shown a high likelihood of

success that at least on this occasion, Long disclosed information that she had a duty to keep confidential and therefore misappropriated Plaintiff's trade secret on behalf of her new employer.[16]

Although "trade secret law does not provide a reserve clause for solicitous employers," *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995), a former employee may not use the specific, confidential information she gained from a former employer to win clients from her former employer. *AMP, Inc.*, 823 F.2d at 1202. An employee has a right to use the skills and generalized industry she gained from her former employer when taking a new job at a competitor, but she may not simply take and use that employer's confidential information in her new position. See generally *APC Filtration, Inc.*, 646 F. Supp. 2d at 1008. In at least this one instance, Plaintiff has met its initial burden to show Long crossed that line. However, given that Plaintiff must show it faces future irreparable harm to qualify for the entry of a preliminary injunction (as explained in greater detail in Section 2 below), the Court turns to Plaintiff's claims of inevitable disclosure.

As explained above, Illinois law controls on that issue. In addition to traditional theories of actual misappropriation, the Seventh Circuit has concluded that Illinois and federal law also recognize a cause of action for the "inevitable disclosure" of trade secrets. In other words, a "plaintiff may prove a claim of trade secret misappropriation by demonstrating that [a] defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc.*, 54 F.3d at 1269. For example, in *PepsiCo* the Seventh Circuit addressed whether a plaintiff corporation was entitled to a preliminary injunction against its former CEO to prevent him for using its trade secrets in his new position with a direct competitor. *Id.* at 1270. Because he had previously had access to the plaintiff's strategic plans, the plaintiff argued, the former CEO would

---

[16] As explained below, however, the Court does not conclude that Plaintiff has shown this disclosure, or any other disclosure, supports an injunction preventing Price f(x) from moving forward with its contract with Herman Miller.

be able to perfectly anticipate how his former employer would "price, distribute, and market" its product. *Id.* The district court agreed, explaining, "unless the [defendant] possessed an uncanny ability to compartmentalize information," he could not help but rely on the information that he had learned as CEO when charting the strategic course for his new employer. *Id.* at 1269. Noting that "[t]his type of trade secret problem may arise less often," the Seventh Circuit agreed, affirming that the circumstances of the case fell "within the realm of trade secret protection." *Id.* However, the court of appeals also emphasized that "the mere fact that a person assumed a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose * * * trade secret information' so as to 'demonstrate irreparable injury.'" *Id.* at 1269 (quoting *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1207 (7th Cir. 1987)).

In light of *PepsiCo*, courts in this district have employed a three-factor analysis to evaluate whether a defendant will inevitably disclose trade secrets in her new position. See, e.g., *Gen. Elec. Co. v. Uptake Techs., Inc.*, 2019 WL 2601351, at *10 (N.D. Ill. June 25, 2019). Specifically, courts consider "(1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." *Saban v. Caremark Rx, L.L.C.*, 780 F. Supp. 2d 700, 734–35 (N.D. Ill. 2011) (citing *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001)).

Here, there is no real dispute that Price f(x) and Plaintiff are direct competitors. While Defendants make a great deal of the different offerings of the two companies and their different price points, see [90, at 35–36], it is indisputable that both companies sell pricing solutions and compete for at least some subset of the same customers. Likewise, while Defendants correctly

note that Long's new role involves managing individuals, see [80, at 52:1–12; 76:17–20], one of Defendants' witnesses testified that on at least one occasion he reached out to Long for help developing a presentation for a specific client, [*id.* at 74:12–76:8]. Indeed, as previously detailed above, Long provided client-specific information in response to that request to be used in the pitch to that client. See [59-19, at 2]. This involvement in the day-to-day work preparing presentations for client pitches, while perhaps a smaller portion of her workload in her new position at Price f(x) than in her former position at Plaintiff, is hardly different from the work Long performed as a business consultant at Plaintiff. See [12, at 40 (¶ 26) (explaining that Long "worked with both existing customers and prospects throughout the sales cycle to assess a customer's pricing, to recommend and facilitate solutions and proposals, and to help deliver Vendavo's products and services").] Indeed, as Plaintiff points out, the individual who formerly held Long's role at Price f(x) acknowledged that while he was responsible for all the "ninjas,"[17] he also served as the sole "ninja" on several projects himself. [89-17, at 10 (31:17–33:3).] Consequently, the Court concludes that Long's former role with Plaintiff overlaps with her new role at Price f(x).

With regard to the third factor—the steps taken to prevent disclosure—Defendants strenuously point to the numerous communications with Long in which Price f(x) instructed Long not to bring or to use any of Plaintiff's confidential or trade secret information in her new role. See, e.g., [52-1, at 2 (email to Long providing a checklist of items to complete to ensure she did not bring any trade secrets with her)]; [52-2, at 2 (letter instructing Long to refrain from bringing or communicating any of Plaintiff's confidential information)]. Price f(x) also purportedly provided oral reminders of these obligations, see [80, at 30:2–8], and asserts that it took certain other measures on the advice of counsel to prevent the inadvertent transfer of trade secrets, [*id.* at

---

[17] The parties acknowledge that the position that Price f(x) refers to as a "ninja" are functionally equivalent to Plaintiff's title of "business consultant."

32:8–25]. However, as just noted, none of these measures prevent Long from providing one of Plaintiff's trade secrets to one of Price f(x)'s other employees upon request. See generally [59-19].[18] There is, however, an easy solution to the problem that it appears Plaintiff already uses: prohibiting Long from working on any client that she previously worked with while she worked for Plaintiff.[19] See [78, at 109:5–10 (explaining that Plaintiff prohibited a new hire from working for any client he previously worked with at one of Plaintiff's competitor).] Such a prohibition would have prevented the misappropriation that the Court concludes has occurred, as well as any future misappropriation. Moreover, Price f(x) has clearly recognized the danger of incidentally, or even accidentality, misappropriated trade secrets as it retained counsel to provide it with advice to proactively prevent such transfers from occurring. See [80, at 31:18–32:17]. Thus, its failure to prevent the misappropriation above calls into question the efficacy of its measures and supports finding that without additional measures other disclosures could occur.

At bottom, the situation in this case is largely analogous to the situation in *PepsiCo*. As in *PepsiCo*, Plaintiff asserts that if Long and Price f(x) are allowed to use even the information in her head about the pain points of her former customers and Plaintiff's proposed solutions to those problems, they will have an unfair advantage by avoiding the costly process of actually discovering companies' pricing issues and will pitch an identical solution to those issues. In other words, as in *PepsiCo*, Plaintiff "finds itself in the position of a coach, one of whose players has left, playbook

---

[18] Defendants argue that even if Long transferred a trade secret in that email, no harm arose from the transfer. See [90, at 22 (asserting that the information was "too little, too late" to have any effect on the outcome of the negotiations with that client that eventually signed with Price f(x))]. However, determining whether the doctrine of inevitable disclosure applies does not require the Court to consider whether previous disclosures caused harm. Indeed, the whole purpose of the doctrine is to prevent any future harms from occurring.

[19] As previously explained, and reiterated below, the Court does not believe a permanent bar is appropriate.

in hand, to join the other team before the big game."  54 F.3d at 1270.  Such a situation poses a threat of irreparable harm and therefore supports the grant of a preliminary injunction.

Defendants counter that Plaintiff has done no more than show that a skilled employee left to take her skills elsewhere.  But, as in *PepsiCo*, Plaintiff has done much more.  Plaintiff has shown that Long has specific knowledge about contacts at current and prospective clients that would be invaluable to Price f(x) as they seek to broaden their presence in the pricing software marketplace.  Indeed, Long not only identified the value of this information in the "business plan" for Price f(x) that she created in 2017 while still working for Plaintiff, but also demonstrated that she intended to use it for Price f(x)'s benefit.  See [72-3, at 6 (explaining that Long and her friend could help Price f(x) expand because "we know the market & can get the meeting").]  And, even more importantly, Plaintiff has shown that Long has specific knowledge about the "pain points" or pricing issues at particular companies that on at least one occasion she has already shared, and unless she possesses an "uncanny ability to compartmentalize" or forget information, she cannot but rely on that information as she works on projects or supervises those working on clients she received information regarding while at Price f(x).  For that reason, the Court concludes that Plaintiff has shown it is likely to succeed with regard to its argument that allowing Long to work for clients she previously worked with at Plaintiff, or whose information she brought with her after departing from Plaintiff, will result in the inevitable disclosure of Plaintiff's trade secrets.

In summary, Plaintiff has shown that Long retained a large amount of its documents after her termination that should have been returned to Plaintiff or disposed of.  At least some of those documents contained information that the Court concludes are protectable as trade secrets. Additionally, on at least one occasion Plaintiff disclosed one of those trade secrets—namely, the key pain point of one of Plaintiff's target clients—to another employee at Price f(x) after that co-

worker requested the information. Finally, Plaintiff has demonstrated that (1) there is a high level of competition between it and Price f(x); (2) Long's position with Price f(x) is comparable to the position she held with Plaintiff; and (3) Price f(x) has not put in place adequate safeguards to prevent Long from using or disclosing Plaintiff's trade secrets in light of her disclosures related to Herman Miller. Based on these findings, the Court concludes that Plaintiff has shown that it is likely to succeed on its claim that Long misappropriated its trade secrets and that there is a threat of inevitable disclosure of further trade secrets without additional safeguards.

By contrast, Plaintiff has not shown a likelihood of success as to an injunction prohibiting Price f(x) from continuing to work with Herman Miller, Metrie, Panduit, Watsco, and Mabe. Although it appears that some of the information Plaintiff took specifically related to Mabe, Herman Miller, and Metrie—companies with whom Price f(x) has won contracts—Plaintiff has not pointed to specific information regarding Panduit and Watsco that Long took.[20] Rather, Plaintiff has merely put forward evidence that Long divulged the fact that these companies were seeking pricing software. See [59-23]; [59-24]. As the Court already explained, however, Plaintiff has not convinced the Court that the fact that a company is looking for a pricing solution should be treated as a trade secret; nor is there any evidence Price f(x) is in serious negotiations with either company. And, even with regard to Mabe and Metrie, Plaintiff's own internal documents demonstrated that those companies picked Price f(x) because of Price f(x)'s relationship with Bain in the case of Mabe and mainly on price in Metrie's case. [52-10, at 5.] Herman Miller is the only company for which Plaintiff even identified Long as the cause of the lost contract, [see *id.*], or has

---

[20] Indeed, the Court was unable to locate any claims regarding Panduit and Watsco in Plaintiff's initial application for a preliminary injunction. The companies do not actually appear in Plaintiff's briefing until its reply brief. See [59, at 4.]

provided evidence that Long supplied information to Price f(x) that could have helped it win the contract, see [59-19].

Given Plaintiff has shown likelihood of success as to at least some of its claims, however, the Court proceeds to the next step of the preliminary injunction analysis.

### 2. Irreparable injury and inadequacy of the remedy at law

In addition to showing that it has more than a negligible chance of succeeding on the merits, Plaintiff also must show that it will suffer an irreparable injury absent action by the court and that there is no adequate remedy at law. "These two requirements—irreparable harm and no adequate remedy at law—tend to merge." *Mintel Int'l Grp., Ltd. v. Neergheen*, 2008 WL 2782818, at *5 (N.D. Ill. July 16, 2008) (citing *Roland Machinery Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 387 (7th Cir.1984). "The question is then whether the plaintiff will be made whole if he prevails on the merits and is awarded damages." *Roland Machinery Co.*, 2018 WL 2782818 at *5. Irreparable harm is harm that is "not fully compensable or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction, or both) in the plaintiff's favor." *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013). Importantly, there is "a presumption of irreparable harm to the plaintiff in cases of trade secret misappropriation * * *." *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004); see also *Arjo, Inc. v. Handicare USA, Inc.*, 2018 WL 5298527, at *9 (N.D. Ill. Oct. 25, 2018); *Intertek USA Inc. v. AmSpec, LLC*, 2014 WL 4477933, at *6 (N.D. Ill. Sept. 11, 2014).[21] However, "defendants may rebut this presumption by demonstrating that plaintiff will not suffer any harm if the injunction is not granted." *Id.*

---

[21] While this presumption remains intact, the Court notes that in *eBay Inc. v. MercExchange, LLC*, the Supreme Court noted that it has consistently "rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed." 547 U.S. 388, 392-93 (2006). However, given that neither side has raised *eBay*, the Seventh

Here, Plaintiff asserts that if Defendants are allowed to retain access to the information in question, the release of that information will (1) damage its relationships with current and prospective customers, (2) undermine its competitive edge in marketing, (3) lead to significant price erosion, and (4) cause it to lose market share. Defendants retort that Plaintiff has not put forward any evidence in support of those claims, and that, in any event, there is no risk of future harm given Plaintiff has already recovered all the documents from Long and Vendavo does not have any copies.

As explained above, the Court has found that in the short time that Long worked for Price f(x), she shared Plaintiff's trade secrets with other employees at Price f(x) on at least one occasion. See Section (1)(c) *supra*. At the same time, Defendants correctly point out that there is no evidence that Long still has any physical or electronic copies of the purported trade secret information, and Plaintiff has not opposed this assertion with anything but conjecture. See [89, at 51 ("In addition, given the large volume of documents that Ms. Long had in her possession and that were recovered at her home, it is likely that she has documents elsewhere.")]. Thus, her former possession or improper retention of Plaintiff's documents at her home, in her Dropbox, in her email, *etc.* cannot form the basis of an injunction.[22]

Notwithstanding Plaintiff's recovery of those documents, however, Long undoubtably knows and remembers certain details about her former clients—as she has already demonstrated— that she may not share with her current employer. And as explained above, it is fair to infer that she will use those trade secrets, perhaps even inadvertently, unless prohibited from working on

---

Circuit does not appear to have applied *eBay* in a trade secret case, and Plaintiff has shown irreparable harm, the Court need weigh in on the issue at this time.

[22] Indeed, at this juncture, the Court is not convinced that Plaintiff has actually suffered any actual pecuniary harm from the misappropriation that has occurred so far.

projects for her former or prospective clients at Plaintiff. This is especially true as to information regarding Plaintiff's clients' pain points and the names of specific contacts at those clients, which would allow Long to continue to negotiate with her former clients as if she had never left Plaintiff.

Long is certainly allowed to compete against Plaintiff given the absence of a non-compete in her agreement. See *APC Filtration, Inc.*, 646 F. Supp. 2d at 1008 ("in a competitive market, an employee must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his chosen occupation.") (citing *Service Centers of Chicago, Inc. v. Minogue*, 535 N.E.2d 1132, 1135 (Ill App. Ct. 1989)). However, the Court has also concluded that she actually misappropriated some information while working for Price f(x) and would inevitably disclose trade secrets in working on her former clients. See Section (1)(c) *supra*. This inevitable disclosure of trade secrets supports finding an irreparable harm that cannot be adequately addressed by a legal remedy because it would be essentially impossible to determine the costs Price f(x) unjustly avoided by using these secrets, or the damage to Plaintiff's sales that could be caused by allowing Long to use its own secrets against it. However, these concerns only apply to clients that Long had information regarding, or worked on, while she worked for Plaintiff. Indeed, given all the other documents have been confiscated from Long, there is little if any support for prohibiting her from working on any clients but those whose information she actually accessed, not merely copied, or on whose accounts she actively worked on while at Plaintiff.

The opposite is true with respect to Plaintiff's request for an injunction against Price f(x) requiring it to cease negotiations/operations with Herman Miller, Metrie, Panduit, Watsco, and Mabe. First, it appears that the negotiations with Metrie, Mabe, and Herman Miller have been completed, and they have signed or are in the process of signing with Price f(x). Each of those contracts had a certain value to Plaintiff, and those values are not so uncertain as to defy estimation.

See, e.g., [52-9 (Plaintiff slide deck placing explicit values on the Mabe and Metrie deals)]; [52-10 (same)]. Notwithstanding those finite values, Plaintiff asserts that clients are "sticky," and as such once a company picks a pricing vendor they generally do not switch, making the total valuation of a deal nearly impossible. [12, at 50 (¶ 78).] However, as Defendants point out, both Plaintiff and Price f(x) have won customers from other competitors, thus the "lock-in" effects that Plaintiff fears cannot be so great as to prohibit a company from switching providers. See, e.g., [72-10, at 28 ("Ring the Bell" email noting that Plaintiff had won business from one of its competitors)]. But even if they were, as explained below, the balance of harms and public interest strongly weighs against such an injunction. And, with regard to Mabe, Metrie, Panduit and Watsco, Plaintiff has not even met its requisite showing regarding its likelihood of success. Consequently, at this point the Court cannot conclude that Plaintiff has shown an irrepealable harm or the inadequacy of legal remedies that would justify an injunction as to Price f(x) and the five named companies. With that, the Court turns to the balance of harms and public interest regarding the entry of a preliminary injunction.

### 3. Balancing the Harms and Public Interest

Balancing the irreparable harm to the moving party if an injunction is not entered against the harm to the non-moving party if an injunction is granted requires the Court to use a "sliding-scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *In re Aimster Copyright Litigation*, 252 F. Supp. 2d 634, 648 (N.D. Ill. 2002). Indeed, as the Court previously observed in *Mintel Int'l Grp., Ltd. v. Neergheen*, where the injunctive relief sought primarily focuses on prohibiting a defendant from using information he should not have taken in the first place, the balance of harms weighs heavily in favor of granting an injunction. 2008 WL 2782818, at *6 (N.D. Ill. July 16, 2008).

Here, as in *Mintel*, two of the three categories of injunctive relief Plaintiff seeks simply seek to prohibit Long and Price f(x) from using its trade secrets against it or otherwise abusing it. See [59, at 4 (requesting an injunction (1) barring Long from participating in any client or prospective client accounts she was involved in while at Plaintiff or for which she stole trade secret information and (2) prohibiting Price f(x) and Long from using, accessing, or disclosing any trade secrets taken from Plaintiff by Long)]. And, in view of the Court's conclusion that Plaintiff is likely to succeed in showing that at least some of the information taken by Long was a trade secret, any harm Defendants suffered as a result of such an injunction would be a consequence of their own conduct. Thus, the balance of harm favors Plaintiff as to the injunction prohibiting any further trade secret disclosure.

By contrast, and as Defendants correctly note, an injunction prohibiting Price f(x) from soliciting or working with Herman Miller, Metrie, and Mabe would place a massive burden on innocent third parties given those entities appear to have now invested substantial amounts of their own resources into advancing their contracts with Price f(x). See, e.g., [80, at 35:5–9 (explaining that Mabe had signed with Price f(x) and that the product would go live within a few months)]; [*Id.* at 67:9–16, 68:9–69:2 (explaining that Herman Miller has almost closed with Price f(x) and detailing the amount of effort both sides have put into finalizing the agreement)]. Similarly, while it appears that there would be little harm to Panduit or Watsco from an injunction, Plaintiff has not shown it is likely that Long or Price f(x) misappropriated trade secrets as to those companies. Consequently, the balance of harms and public interest weigh against the entry of injunction as to Herman Miller, Metrie, Mabe, Panduit, and Watsco.

### C. Conclusion

For the reasons explained in detail above and briefly summarized below, the Court finds that issuing a following preliminary injunction is appropriate. Plaintiff has demonstrated that its case has a likelihood of success on the merits; no adequate remedy at law exists; and that it will suffer irreparable harm if the Preliminary Injunction is not granted. Plaintiff has proven a *prima facie* case of trade secret misappropriation because it has shown (a) that Long wrongfully disclosed trade secret information to another Price f(x) employee; and (b) that Long is likely to inevitably disclose Plaintiff's trade secret information given (1) there is a high level of competition between Plaintiff and Price f(x); (2) Long's position with Price f(x) is comparable to the position that she held with Plaintiff; and (3) Price f(x) has not taken adequate actions to prevent Long from using or disclosing Plaintiff's trade secrets in light of her disclosures related to Herman Miller. However, as the Court noted at oral argument and asked the parties to explain in their supplemental briefs, see, e.g., [77, ¶ 4], any information that Plaintiff knows or possesses cannot retain its value forever as companies change and people move on from their former positions. Consequently, the Court shall limit the initial preliminary injunction entered today to one year from today, subject to extension on a motion by Plaintiff. Furthermore, Long's inevitable disclosure of Plaintiff's trade secrets will irreparably harm Plaintiff because it would be essentially impossible to determine the costs that Price f(x) unjustly avoided using these secrets' disclosure, or the damage in Plaintiff's sales that could be caused by allowing Long to use Plaintiff's own secrets against it. Therefore, monetary damages will fail to address such damage and Plaintiff has no adequate remedy at law. Moreover, the harm to Plaintiff outweighs any harm to the Defendants or third parties in being preliminarily enjoined by the entry of this Order.

Accordingly, the Court shall issue a preliminary injunction as follows for a period of one year, starting from today and subject to extension on a motion by Plaintiff:

1. Defendant Long is preliminarily enjoined from participating in any client or prospective client accounts (1) that she was involved in while employed at Vendavo, or (2) that she accessed[23] files related to in the three years prior to her departure from Vendavo on January 28, 2019;

2. Defendants Price f(x) AG and Price f(x) Inc. are preliminarily enjoined from allowing Defendant Long to participate in any client or prospective client accounts (1) that she was involved in while employed at Vendavo, or (2) that she accessed files related to in the three years prior to her departure from Vendavo on January 28, 2019;

3. All Defendants are enjoined from using, accessing, or disclosing any of the categories of information recognized as trade secrets by the Court's opinion in Section IV(B); and

4. Plaintiff's deposit of ten thousand dollars ($10,000) shall remain in place; and Plaintiff shall deposit another ninety thousand dollars ($90,000) to bring the total bond to $100,000.[24]

## V. Motion to Dismiss

As previously noted, this case is just one of the many fronts in a multi-forum, multi-front conflict over intellectual property between Plaintiff and Price f(x). Supporting that notion, Price f(x) has moved to dismiss [32] this case on claim splitting grounds, or, in the alternative, to transfer

---

[23] The mere presence of documents related to clients in paper or electronic form within Plaintiff's possession does not suffice to place those clients within the ambit of this Order. Rather, Plaintiff must show a good faith basis to believe that Long actually accessed the information within those files in the relevant period. To that end, now that the documents are completely within its control, Plaintiff shall provide a list to Long's counsel no later than 30 days after the entry of this order identifying the clients it believes are encompassed within the order. After the parties have resolved any disputes regarding that list, counsel may inform Long.

[24] Although Defendants requested that this Court substantially increase the bond to over $1 million to cover all of Long's lost salary and the cost to Price f(x) of Long's unavailability, see [51, at 50], because the Court is entering a fairly narrow injunction, the Court has elected to set the bond to approximate the amount that Long and Price f(x) may have lost during the pendency of this motion when Long was not working at all. Given the Court's injunction allows Plaintiff to resume work in her desired profession with some limitations, however, a bond in the full amount of her full salary would be too high. Finally, either party may move at any time for reconsideration of the amount of bond.

the case under 28 U.S.C. § 1404(a) to the Northern District of California to join the pending suit between Price f(x) and Plaintiff. See generally [33]. The Court initially delayed briefing on the motion until after the hearing on the preliminary injunction. See [41]. Since then, counsel for Defendant Long has represented in open court that Long would not oppose personal jurisdiction there, and the parties have fully briefed the motion. See [81], [84].

Section 1404(a) states that "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all the parties have consented." 28 U.S.C. § 1404(a). Indeed, under § 1404(a) a court may transfer matters on an "individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). Therefore, district judges receive "a substantial degree of deference * * * in deciding whether transfer is appropriate." *Research Automation, Inc. v. Schrader–Bridgeport Int'l, Inc.*, 626 F.3d 973, 977–78 (7th Cir. 2010). The Court may transfer a case under § 1404(a) when: "(1) venue is proper in the transferor district; (2) venue is proper in the transferee district; (3) the transfer will serve the convenience of the parties and witnesses; and (4) the transfer will serve the interests of justice." *Hanover Ins. Co. v. N. Bldg. Co.*, 891 F.Supp.2d 1019, 1025 (N.D. Ill. 2012).

While Defendants maintain that this Court could and should dismiss the suit against Price f(x) on claim splitting grounds rather than transferring it to California, see [84, at 1], having no familiarity with the California litigation, the Court concludes that transferring the case is proper given (1) all parties have consented to proceeding in the Northern District of California and (2) that forum is much better suited to resolving whether any part of this case should be dismissed for claim splitting. Consequently, the Court grants Defendants' motion [32] in part and will transfer the case forthwith to the Northern District of California.

## VI.    Retention of Jurisdiction

One final issue remains.  In their reply in support of their motion to dismiss, Defendants request that, in the event that the Court transfers the case to the Northern District of California, it retain jurisdiction to hear any motions for sanctions under Rule 11.  [100, at 4–5.]  In response, Plaintiff requested leave to file a sur-reply, [110], which the Court granted on August 14, 2019 [116].  As an initial matter, the Court notes that no party has actually filed a Rule 11 motion; thus, as of now the question is purely hypothetical.  There is some authority for the proposition that a district court *may* exercise jurisdiction over a Rule 11 sanctions motion after the case has been transferred to another district under § 1404.  *Laine v. Morton Thiokol, Inc.*, 124 F.R.D. 625, 627 (N.D. Ill. 1989) (citing *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1078 (7th Cir. 1987)); see also *Szabo*, 823 F.2d at 1077–78 (explaining that voluntary dismissal of a case does not prevent a court from awarding reasonable expenses (including attorneys' fees) under Rule 11).  However, without a Rule 11 motion before it, the Court declines to address the issue at this time.

**VII.    Conclusion**

For the reasons explained above, the Court orders as follows:

(A)    Plaintiff's motion for a preliminary injunction [11] is denied in part and granted in part, and for a period of one year, starting from today and subject to modification on motion:

1.    Defendant Long is preliminarily enjoined from participating in any client or prospective client accounts (1) that she was involved in while employed at Vendavo, or (2) that she accessed files related to in the three years prior to her departure from Vendavo on January 28, 2019;

2.    Defendants Price f(x) AG and Price f(x) Inc. are preliminary enjoined from allowing Defendant Long to participate in any client or prospective client accounts (1) that she was involved in while employed at Vendavo, or (2) that she accessed files related to in the three years prior to her departure from Vendavo on January 28, 2019;

3.    Plaintiff shall provide a list to Long's counsel no later than 30 days after the entry of this order identifying the clients it believes are encompassed within paragraphs (A)(1)-(2) above.

4.    All Defendants are enjoined from using, accessing, or disclosing any of the categories of information recognized as trade secrets by the Court's opinion in Section IV(B); and

5.    Plaintiff's deposit of ten thousand dollars ($10,000.00) shall remain in place, and Plaintiff shall deposit another ninety thousand dollars ($90,000) to bring the total bond to $100,000.

(B)    Plaintiff's motion for a sur-reply or alternatively to strike [103] is granted in part (as to the sur-reply) and denied in part (as to the request to strike);

(C)    Defendants motion to strike [93] is granted;

(D)    Defendant's motion for leave to file a sur-reply [60] is granted;

(E)    Defendants' motion to dismiss [32] is granted in part.  Pursuant to 28 U.S.C. § 1404, the Clerk is directed to transfer this case forthwith to the Northern District of California, where the related case 3:17-cv-06930 (*Vendavo, Inc. v. Price f(x) AG, et al*) is pending; and

(F)    All other pending motions remain open for disposition in the transferee court.

Dated: August 30, 2019

_____
Robert M. Dow, Jr.
United States District Judge